Porto Rican Leaf Tobacco Co., Plaintiff and Appellant, *v.* Moisés Colón, Defendant and Appellee.

No. 7022. Argued January 24, 1936.—Decided July 6, 1936.

*J. Henri Brown, C. Ruiz Nazario, G. E. González* and *G. Benítez Gautier* for appellant. *L. Santiago Carmona* for appellee.

Mr. Justice Hutchison delivered the opinion of the Court.

The Porto Rican Leaf Tobacco Company appeals from an adverse judgment in an unlawful detainer proceeding and says that the district court erred in refusing to admit as evidence the carbon copy of a letter. From the transcript of the evidence we take the following extract:

"Plaintiff. We withdraw the document. We submit as evidence the carbon copy of a letter dated October 20, 1934, addressed to Mr. Moisés Colón, Comerío, Puerto Rico, prepared under the direction of and duly posted by this attorney.

"Defendant. We object to the admission of this document. It does not appear that the court has been requested to summon Mr. Moisés Colón to whom said letter had been addressed.

"The court. The admission of this document is denied, under section 24 of the Law of Evidence.

"Plaintiff. We take an exception."

Assuming without holding that the statement of counsel amounted to "proof of the due mailing of the letter" within the meaning of Section 84 of the Law of Evidence, the district judge should have admitted the carbon copy if otherwise unobjectionable. *Puig* v. *Soto,* 18 P.R.R. 130, 136. The letter, however, is not before us and in view of the conclusion reached as to other aspects of the case the error herein complained of is not a sufficient ground for reversal.

Other assignments are:

"2. The trial court erred in finding that the conflict of title in the instant case is clear.

"3. The trial court erred in finding that the defendant herein supplied the element of proof necessary to establish a conflict of titles.

"4. The trial court erred in weighing the evidence submitted in the instant case by the defendant."

In an equitable foreclosure suit brought by the Porto Rican Leaf Tobacco Company against Rafael Cruz and his wife, Juana María Díaz Sánchez, a special master sold to the

tobacco company 9.33 *cuerdas* of land "bounding on the North with the Bayamón-Comerío road, and lot belonging to José Moisés Colón Virella; on the East with property of Portalatina Cruz Rivera; on the South with La Plata River; and on the West with La Plata River and lands of Juan Oliveros." In the unlawful detainer proceeding the tobacco company alleged that Moisés Colón was the owner of a parcel of land within the 9.33 *cuerdas* described as follows:

"Rural building lot in the Palomas Ward of Comerío which measures 14.83 meters or 49 feet in front and at the rear, and 18.96 meters or 62 feet inches on each side, these measurements being taken from the very center of the gutter on the south side of the road, with an area of 283.07 square meters, equivalent to seven hundredths of a *cuerda,* or 3 ares, 7 centiares and 3 milliares, bounded on the North by the Comerío–Bayamón road, on the West, East and South by the remaining estate belonging to Rafael Cruz Díaz. There is on it a house which is partly a one-story structure with an upper floor at its rear, the main floor being built of wood on a concrete base and roofed with galvanized iron. It measures 7.10 meters in front and 11.50 meters at the rear, including the balcony, and there is annexed to it on the right side at the southeastern end a section intended to be used as a kitchen and a bath-room, built of concrete with galvanized iron roof, which measures approximately 4.90 meters in front by 4.50 meters deep. The ground floor has the same width as the main building and is about 4 meters deep, being built of reinforced concrete."

The tobacco company also alleged that after the commencement of the mortgage foreclosure suit, August 7, 1931, Moisés Colón extended his fence so as to include the parcel now in controversy described in the complaint as follows:

"Parcel of land located in the Palomas Ward of Comerío. It is 46 meters long on its north side and is bounded by the Bayamón–Comerío road; 50 meters long on the South and bounded by the Porto Rican Leaf Tobacco Company; 26.50 meters long on the East and bounded also by the Porto Rican Leaf Tobacco Company, and 26.62 meters long on the West and also bounded by the same Porto Rican Leaf Tobacco Company."

■ The question is whether defendant's claim of ownership is so manifestly unsubstantial and untenable as not to demand serious consideration or whether the evidence in support thereof was sufficient to raise a legal issue. It is well settled that conflicting claims as to titles if bona fide can not be tried and determined in an unlawful detainer proceeding. A flimsy pretense will be brushed aside. An apparently bona fide claim supported by evidence sufficient to show some color of right, evidence sufficient to present a genuine question of title, will justify and require a dismissal of the proceeding. We shall not stop to review the decided cases. See judgment of the Supreme Court of Spain of May 12, 1919 (146 *Jurisprudencia Civil* 281, 288) ; *Segundo González* v. *Colón,* 49 P.R.R. ____ ; *Lippit* v. *Llanos,* 47 P.R.R. 254; *Laureano* v. *Díaz,* 48 P.R.R. 684; *Brunet* v. *District Court,* 45 P.R.R. 871; *Schuck* v. *Verdejo,* 43 P.R.R. 64; *Rubert Hnos.* v. *Hernández,* 43 P.R.R. 920; *Mojica* v. *González,* 43 P.R.R. 956; *Ermita* v. *Collazo,* 41 P.R.R. 594; *Heirs of Dávila* v. *Collazo,* 41 P.R.R. 173.

■ Moisés Colón, defendant in the instant case, testified that Rafael Cruz owned two *cuerdas* of land and purchased more increasing his acreage to 9 *cuerdas;* that defendant and his family lived in a house formerly belonging to him but now the property of the People of Puerto Rico and in another house built by defendant on land adjoining the government property; that he was in possession of this land as owner thereof; that he had it fenced and planted; that he bought in 1922 or 1923; that in addition to the house, he built on the west a garage with a concrete base and a super structure of galvanized iron; that the garage was destroyed by the San Felipe hurricane but the debris remained; that he built the garage in 1922 or 1923 and remained in possession thereof until it was destroyed in 1928; that he was in possession of the two houses, the garage and about a quarter of a *cuerda* of land; that he had been in possession of the parcels marked X and Y on a map introduced in evidence

by plaintiff since 1921; that witness had planted grass and plantains and kept a cow; that he had lived there with his family since 1921; that he purchased the land from Rafael Cruz; (identifying it on the plat) that he made Cruz a present of $50; that before this transaction there was a parcel belonging to a relative of Cruz who wanted to sell to witness; that Cruz was interested in the matter and offered to give witness the piece of land which he wanted and it was marked off in 1921 pending execution of the deed; that don Belisario Boscana, of Comerío, drafted a document which was to be converted into a formal conveyance when the title to the two *cuerdas* which was in process of administration should be cleared; then came the San Felipe hurricane and destroyed the house and the document with everything else was lost, although the *volumen* where all the documents had been was recovered; that Boscana had it; that attorney Rodríguez had read it; that the document was a sale of the adjoining parcel of land in addition to the house; (on cross examination) that the house was acquired by the People of Puerto Rico for taxes; that the "Santini Fertilizer" had previously taken it under execution; that Finlay had also foreclosed the mortgage or attempted to foreclose the mortgage; that the house and lot which had been previously recorded was the property involved in the proceedings brought by the People of Puerto Rico and the Santini Fertilizer; that the two lots were purchased at the same time, first the house and then the lot on which the house stands; that the sale in which don Belisario had to do was the sale of the lot adjoining the house; that this was almost immediately after the acquisition of the house and lot; that witness can not state the number of days or months or years, that witness can not specify the exact day; that it was in 1922 or 1923; that in the course of the transaction, Cruz ceded the land to witness, some time about 1923, in 1922 or 1923; that Rafael Cruz ceded the adjoining land to witness after execution of the deed to the house and lot;

that he acquired the adjoining property after acquisition of the house and lot; that the deed to the house and lot was recorded; that the transfer of the adjoining property was made in an "extrajudicial" document; that the formal conveyance of the lot was executed later; that the "extrajudicial" document; was executed afterwards, a few days afterwards, witness can not specify how many; that witness made Cruz a present of $50.00; that Cruz did not want to take anything; that witness did not remember how much he paid for the house and lot; that the fence was there when the tobacco company took possession; that the land in controversy was enclosed by it.

The witness was then questioned, first by the court and thereafter by counsel for defendant as follows:

"The Court: What did you buy first there?

"A. The house.

"Q. Do you own that house at present?

"A. No.

"Q. Who owns that house at present?

"A. The people of Puerto Rico.

"Q. Can you tell who lives in that house?

"A. I and my family.

"Q. What did you buy next?

"A. The lot.

"Q. How long afterwards, more or less, did you buy the lot?

"A. I bought the house in 1920 and the lot in 1921. I am not sure whether it was in 1922 or 1923.

"Q. What took place in connection with the house and the lot?

"A. I mortgaged the same to Finlay either in "24 or in '25.

"Q. I want to know what finally happened. What were the events leading to the ownership of the house and lot by the People of Puerto Rico?

"A. As regards the house and lot, I want to explain, it is a muddle, when . . . .

"Q. I want to know the result of it all. How did the People of Puerto Rico acquire the house?

"A. For the taxes.

"Q. And the lot.

"A. The same.

"Q. What happened next in connection with the house and the lot and everything else? You have mentioned two houses, what about the other?

"A. At that time when I bought the lot . . .

"Q. When did you buy the lot?

"A. Between '22 and '23.

"Q. So that you bought the lot of the second house almost at the time you lost the other house and lot?

"A. Subsequently.

"Q. Then you got that lot before you lost the other two pieces of property?

"A. Before.

"Q. From whom did you buy that second lot?

"A. From Rafael Cruz Díaz.

"Q. Is that the one that you say you bought by private deed?

"A. That is the one.

"Q. Was there any house on that lot?

"A. No.

"Q. Is there any house at present?

"A. There is one.

"Q. Who built it?

"A. I did.

"Q. What is the area of that lot?

"A. I do not know exactly, about one fourth of an acre.

"Q. Did you fence that lot at the time you bought it?

"A. I did.

"Q. What did you fence it with?

"A. With barbed wire and wire netting.

"Q. Are that wire netting and barbed wire still there?

"A. They are.

"Q. Then you built the house?

"A. I did.

"Q. Who lives in that house at present?

"A. I with my family which is numerous and we occupy the two houses.

"Q. So that part of your family lives in the house lately built by you and part lives in the house of the People of Puerto Rico?

"A. Now of the People of Puerto Rico.

"Q. Do you only occupy the house of the People of Puerto Rico or the house and lot as well?

"A. I do.

"Q. Do you occupy the lot and also the house?

"A. I do.

"Q. In short, do you occupy both houses and lots?

"A. I do. I have received notice from the People of Puerto Rico.

"The court. That is all.

"Defendant. What is there to the west of that other lot to which you have referred?

"A. Formerly there was a concrete garage with the upper part built of galvanized iron.

"Q. Is the debries still there?

"A. It is."

The attorney, Francisco Rodríguez Alverio, mentioned by defendant, Colón, while on the stand, testified: that witness in 1924 lived in New York and in 1925 in Comerío; that he knows Rafael Cruz and Moisés Colón; that he is practicing his profession in Comerío; that in 1928 witness leased from Rafael Cruz the property in controversy (sic); that when he went to take possession, Rafael Cruz explained or pointed out to him the landmarks and what was included in the property with the view to indicating the portion covered by the contract of lease and showed him the parcel of land which belonged to Moisés Colón which was enclosed at the time by a barbed wire fence; that the parcel occupied by Moisés Colón was in the parcel leased by witness; that witness had seen it the day of the trial and the day before; that it is the same property leased by witness from Rafael Cruz; that in 1926, Rafael Cruz did not exhibit any document; that Moisés Colón showed it to witness and hold him that he (Colón) wanted to get all the documents which he (Colón) had delivered to Belisario Boscana, which he had left in the office of Celestino J. Pérez; that Belisario, who was a "curial", a scrivener, had died about that time; that Belisario did not work with Pérez; that witness went to work in the office where Belisario had worked; that witness saw a private document executed by Cruz and Colón concerning a lot, the dimensions of which the witness did not remember; that it was the same lot; that they talked to witness

about it when witness leased the property which he had for two years; that witness knew the property well; that a surveyor was brought to survey it; that it contained 9.40 *cuerdas* without counting the property of Moisés Colón; that the river, when it rises, covers certain sandy portions planted to *"malojillo"*; that when witness leased the property there was a *"rejoya"*, as it is called in the country, some .40 of a *cuerda* more or less, planted to *"malojillo"*, which has entirely disappeared and is under the river; that it was measured when possession of the property was delivered to witness; that now it has not been measured; (on cross examination) that witness returned from the United States in June, 1925, and went to Comerío in July; that he rented the property in 1928 at $40 a month; that he saw the private document in 1926, one year after going to Comerío, when he took charge of Colón's affairs; that witness did nothing in regard to the document; that Colón instructed witness to get the papers which had been in the possession of Belisario; that Colón wanted to have them; that Colón did not instruct him to convert it into a public instrument; that witness went to get the papers in order to deliver them to Colón and in order to ascertain whether the papers belonged to Colón witness had to read them; that witness does not remember the exact date of the private document, whether it was 22 or 23; that it was about that time when witness took charge of Colón's affairs; that if attorney Celestino J. Pérez drew the instrument number 69, executed in Comerío on July 17, 1923, witness did not see it; that on the day before the trial the river was not swollen, it was normal, but covered the best part of the property, .40 of a *cuerda;* that when witness rented the property the river, when normal, did not cover that portion of it.

Rafael Cruz testified that he had been the owner of 9 and some hundredths *cuerdas* of land in Palomas; that witness sold the property to Moisés Colón because witness had bought two *cuerdas,* one-half *cuerda* at a time; that witness

bought 4 or 5 *cuerdas* from José Cruz and others and when he bought the first two *cuerdas* he had ceded a lot there which passed through several hands and came into the possession of Moisés Colón and he wanted to buy that property; that witness does not remember the date—some 16 or 20 years ago; that witness bought in 1921; that it was later than 1916 or 1918, from 1921 to 1923; that Colón was negotiating for the property with José Cruz; that witness had bought two *cuerdas* from Carmen Rivera and they could not execute a deed of conveyance; that afterwards witness bought the 7 *cuerdas;* that Colón was negotiating with José Cruz and as witness had bought the two *cuerdas* he said to Colón: "Look here, Moisés, let me have those two *cuerdas*" and he was willing to let witness have them only on this condition, and then he said to me: "And if you will let me have a quarter of a *cuerda* . . . ." that witness gave him the quarter *cuerda;* that witness did not want to accept anything for this but Colón made him take $50 as a gift; that Belisario Boscana, who died in Comerío, drew an extrajudicial document and witness agreed to execute a deed of conveyance whenever Colón might desire it; that witness can not say whether this was the land now occupied by Colón; that it was a quarter of a *cuerda* more or less—it was not measured; (on cross examination) that witness still has his furniture in charge of his brother, Taquito, who occupies the house on the property, some chairs, tables and beds, witness can not name all of the pieces, but he has considerable furniture; that the marshal of the Federal Court was there; that witness told the marshal he could deliver possession if forced to do so and that the question of delivery was pending in the hands of his attorney, Martínez Dávila; that the question is still pending as far as witness is concerned because he has not the money with which to go ahead; that witness does not remember the date of the purchase of the two *cuerdas;* that witness first bought two *cuerdas,* 9 and some hundredths *cuerdas* in all, first two *cuerdas* and after-

wards the rest, a total of 9 and some hundredths *cuerdas;* that before this was the matter of the sale to Colón, before the negotiation with José Cruz, because witness was to cede him a piece of land adjoining the house; that witness marked off some hundredths, a quarter of a *cuerda* more or less, that as witness had the two *cuerdas,* Colón then came to him and then they had a talk; that he then said to witness: "What I am interested in is a quarter of a *cuerda* more or less"; that witness does not remember the date; that witness had made his brother "Taquito" a present of a lot; that the lot was conveyed to Colón; that the lot has been changing hands and when Colón purchased the house witness was about to cede the lot and execute the deed; that witness sold Colón a lot adjoining a house which stood on a lot that witness had given to his brother and which his brother had sold to Juan Longo; that after the cession of the quarter of a *cuerda* to Colón, witness executed a deed conveying to Colón the lot which had been previously ceded and which had been changing hands; that the brother of witness sold it and executed the deed; that when it came into the hands of Colón who bought the house, witness had to execute the deed; that witness believes this was before the cession of the quarter of a *cuerda,* but does not remember; that at the time of the deal as to the lot it was that Colón began negotiating for the house; that witness did not remember whether or not the transfer of the quarter of a *cuerda* followed that transaction; that the lot was a gift but Colón made witness accept $50.00; that the $50.00 was not for the lot on which the house stood; that witness had ceded it to his brother so many years before and his brother sold first the house; that on executing the deed to this lot witness did not receive any money; because the lot on which the house stood was a gift from witness to his brother and his brother sold the house and was entitled to a deed of conveyance; that the house was for a long time unrecorded; that the lot was a gift to to the brother of witness and Colón was purchasing

from another;. that Colón gave witness $50.00 for the other piece.

The surveyor, who shortly before the trial surveyed the property and made the plat introduced in evidence by plaintiff, testified as a witness for plaintiff to the existence of an old fense of woven wire and barbed wire and to the existence of trees along the boundary lines of the parcel in controversy as well as to the existence of the concrete foundations of what had once been a garage within the inclosure. The testimony for defendant is thus corroborated in a measure by the testimony of this witness. It is practically uncontradicted by the testimony of any other witness. Taken as a whole and corroborated to some extent by the testimony of plaintiff's surveyor, it was enough to justify the conclusion reached by the district judge if he had no reason to believe from the demeanor of defendant and his witness or other wise that their story had been concocted and committed to memory. In the typewritten record we find no such evidence of mendacity as to require a reversal.

The judgment appealed from must be affirmed.

Mr. Justice Córdova Dávila and Mr. Justice Travieso took no part in the decision of this case.